THOMAS DIXON, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. Under an indictment for homicide, where the prosecutor seeks to introduce a dying declaration of the deceased in evidence, it should be first shown to the satisfaction of the Court that at the time the declarations were made the deceased not only evidently considered himself in imminent danger, but that he evidently believed he was without hope of recovery. The circumstances under which the statements were made must be shown, in order that the Court may determine whether the statements should be given to the jury as dying declarations.

2. The admissions and declarations of a person accused of crime are competent evidence, and may be proven without first showing that no promise or threat had been held out or made to the accused to induce him to make the statements. If they shall be shown to have been made under improper promises or threats, they should not be received, or if already proved, the testimony should be rejected.

Dixon vs. The State of Florida—Statement of Case.

3. It is not error for the Court to refuse to allow the question to be put to a witness, "whether it was not *possible* that he might have misunderstood what the prisoner said."

4. It is error to allow a witness to give his "understanding" of the meaning of declarations made to him by a person accused of crime, unless the witness is an interpreter or expert.

5. The person killed being a policeman, it is competent to give in evidence on a trial for murder threats of violence made by the accused shortly before the homicide against "policemen," though not particularly against the individual killed.

6. The question put to a witness, "Would you deem a man to be of sound memory and discretion who, under the circumstances, would make use of such an expression as he made in your store?" was properly overruled.

7. It is not error for the Court to refuse to repeat instructions already given to the jury.

8. The Court charged the jury that "when the killing has been proved, the accused must show that it was attended with circumstances of accident, necessity, or infirmity, to reduce it to a lower grade of crime," the accused being charged with murder; *Held,* That the Court should have added substantially, "unless they arise out of the evidence produced against him." Without such qualification the charge of the Court was erroneous, and calculated to mislead the jury, nothwithstanding the Judge may have given the instruction correctly in a former portion of the charge.

9. The jury having returned into Court, asked the instruction of the Court upon a particular question, and the Court gave them an instruction verbally, and afterwards reduced it to writing from memory; *Held,* That under the statutes, the charge and instructions of the Court to the jury must be first reduced to writing, and given to them as written.

10. The Court should give counsel an opportunity to reduce to writing any special instruction, relating to points contained in his charge or instructions, and should give in writing, his own ruling of the law upon the points raised as presented, and declare the same to the jury.

11. It is not error to permit the jury to take with them, when they retire to deliberate, the written charge and instructions of the Court, provided they take the whole of them.

Error to the Circuit Court for Duval county.

Thomas Dixon was indicted for the murder of Ignatio Andrea, at Jacksonville, Duval county, on the 7th day of April, 1869, by assaulting him with a knife, of which wounding Andrea died on the 14th day of said month.

The accused was tried at the Spring Term, 1869, of the Circuit Court for Duval county, and convicted. Upon appeal, the judgment of the Circuit Court was reversed, and a new trial awarded. The case now comes before this court upon a writ of error, a second trial having been had at the Spring Term, 1870, at which the accused was again convicted of murder, and sentence of death was pronounced.

The proceedings, so far as is necessary to present the questions raised by the assignment of errors, are set out in the opinion of the court.

*D. C. Dawkins* and *J. B. C. Drew* for Plaintiff in Error.

*A. L. Woodward, Sr.,* (for Attorney General,) for the State.

RANDALL, C. J., delivered the opinion of the court.

The errors assigned by counsel for plaintiff in error will be considered in their order:

" 1. The court erred in permitting the State Attorney to ask A. W. Dacosta, witness for the State, the following question : ' State the circumstances under which he, (deceased,) made the statements in relation to how he received the wound.' "

" 2. In refusing to rule out the instrument which was submitted as dying declarations of the deceased."

3. In admitting the statements of the deceased given in evidence by Van Dohlen, a State witness.

These points lead to an inquiry into the question, so far as it is applicable to the present case, as to the admission of the declarations of the person injured, in regard to the circumstances of the injury which resulted in his death. " Dying declarations," as they are called, are admitted in evidence upon the general principle that they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone, when every motive to falsehood is silenced, and the mind is induced by the most

powerful considerations to speak the truth.   A situation so
solemn and so awful is considered by the law as creating
an obligation equal to that which is imposed by an oath ad-
ministered in court.   Woodcock's case, 1 Leach, 502.   Dying
declarations of a person who has been mortally wounded,
with regard to the circumstances which caused death, are to
be received with the same degree of credit as the testimony
of the deceased would have been had he been examined on
oath.   Green vs. The State, 13 Missouri, 382 ;  State vs. Fer-
guson, 2 Hill, S. C., 619 ;  Oliver vs. The State, 17 Ala., 587 ;
McLean vs. The State, 17 ib., 672.   And it is a general rule
that dying declarations, though made with a full conscious-
ness of approaching death, are only admissible when the
death of the deceased is the subject of the charge and the
circumstances of the death are the subject of the dying dec-
larations.   Meade's case, 2 B. & C., 600.   They are only
admissible where the party making them knows or thinks
that he is in a dying state,   Positive evidence of this knowl-
edge is not required, but it may be inferred from the general
conduct and deportment of the party ;  and it is not neces-
sary to prove *expressions* of apprehension of immediate dan-
ger, if it be clear that the party *does not expect to survive* the
injury.   Bonner's case, 6 C. & P., 386.   The Supreme Court
of Ohio, in the case of Montgomery, 11 Ohio, 424, say:
" The substantial objection to the proof is, that it was re-
ceived without a preliminary inquiry by the court establish-
ing the fact that the deceased not only made the decla-
rations while *in extremis,* but also that he was conscious of
his true condition.   It is this *consciousness,* coupled with
the condition of the party, which supplies the place of an
oath, and peculiarly distinguishes dying declarations from
hearsay."   It does not seem necessary that the deceased
should have used any expressions declaring his belief that he
would not recover, if his condition was such that he must
have felt he was dying.   In John's case, (1 East P. C., 357,)
it was held by all the judges that if a dying person either

declares that he knows his danger, or it is reasonably to be inferred from his wound or the state of his illness that he *is sensible of his danger*, his declarations are good evidence. In Spilsbury's case, (7 C. & P., 187,) it was held that for the purpose of determining whether the declarations ought to be received, the conduct of the deceased ought to considered to see if it was that of a person convinced that death was at hand, and not merely the expression he used respecting his condition. Without further referring to the cases reported, it is considered that the true rule is, that in order to lay the foundation for receiving a statement as a dying declaration, it should be shown to the satisfaction of the court that at the time it was made the deceased not merely considered himself in imminent danger, but that he evidently believed he was *without hope of recovery.*

The first interrogatory to which objection was made, to-wit: an inquiry as to the circumstances under which the deceased made the statements in relation to the receiving of his wounds, was pertinent and proper. The circumstances under which the deceased made statements must of necessity be shown in order that the court may determine whether the statements were " dying declarations," and proper to be given in evidence to the jury. Whether these declarations are admissible in evidence is exclusively for the court to determine, (Huck's case, 2 Eng. C. L. Rep., 494,) and the question was a proper one for the purpose of informing the court. The answer of the witness related, in part, to what he had previously testified to, to-wit: that he last saw deceased alive on the night of the 7th of April, 1869 ; " he was dangerously wounded in the abdomen ; he did make some declarations to me." Then in response to the interrogatory as to the circumstances under which the statements were made, the witness, Dacosta, answered : " He made the statements in view of his approaching dissolution ; he was dying; he was in his own house ; the prisoner, Mr. Rawson and Mr. Garvin were there ; he was lying on the bed ; there

was no physician there at the time ; the statement was made verbally and was then written." The question was then asked, " were the written and verbal statements the same?" The question was allowed to be answered after objection, and the witness said, " They were in substance." And here the witness being handed a paper, said it is the written statement that deceased made and subscribed. Witness then read the paper as the dying written statement of the deceased, as follows :

" State of Florida, Duval County. The dying deposition of Ignatio Andrea, says upon oath, that on the night of the 7th of April, 1869, in Jacksonville in said County, Thomas Dixon, in and upon him an assault did make with a knife, and him the said deponent did stab with a knife, which it is supposed will cause his death.                    his

                                        IGNATIO ╳ ANDREA.
                                                  mark.

Sworn to, &c.

Witness Dacosta continues :   " I think the deceased died on the 13th April, which is about six days after the 7th of April.   I was there about three quarters of an hour."

This is the whole of Dacosta's testimony and all the testimony in relation to the dying deposition.

There was no testimony going to inform the court that the wounded man was either conscious that his wound was mortal, or that it was thought by deceased that it might prove fatal.   Not one word as to whether he thought there was any hope of recovery.   No physician was present at the time, and we are not informed by the record whether one had visited deceased at this time.   The character of the wound is not described by the witness, nor does he say that he saw it.   The statements of the witness give the opinion of the witness only as to the condition of the deceased.   It does not appear that the writing was read to him, nor that he read it, or that he knew its contents, or that he signed it or swore to it.   The language of the deposition is not appa-

rently the language of the deceased, but it is put in the third person, like the common recital of an affidavit, and the words are those of the magistrate. There was no foundation laid for the introduction of this paper as a dying declaration, nor for the introduction of any " dying statements," and it should therefore have been excluded from the consideration of the jury. The testimony of Van Dohlen was that he saw Andrea lying on the floor of the piazza of Mr. Sedgwick's house " with his guts out." " He seemed to be wounded," and appeared to have a great deal of pain. " I asked Ignatio Andrea who cut him ?" The State Attorney inquired " What did he say in answer to your question ?" The court, against objection, admitted the answer, and witness testifies, " He said, the same colored man that was cursing in your store awhile ago, he cut me," (this referring to the plaintiff in error.)

There is the same absence of testimony going to show the consciousness, or apprehension of impending death, as in the instance first referred to, and there is really no ground for receiving this testimony except an imperfect description of the wounds, without anything further to show that the deceased knew the extent or character of the injury.

This testimony should have been rejected as mere hearsay, and because it was received and given to the jury the court erred.

It is further insisted that the court erred, 4th, in permitting the State Attorney to ask A. W. Dacosta, " Were the written and verbal statements the same ?"

It is very clear that this method of proving and identifying the statements is quite irregular for the purpose of showing what the verbal statement was, but it is not very material or important here.

The 5th, 7th and 8th grounds of error assigned are that the court permitted the witnesses Rawson and Brown to state what were the declarations and confessions of the prisoner in relation to the transaction in question. It is insisted

that the proper predicate was not laid, because it did not clearly appear that no inducement was held out to the prisoner to make the confessions or admissions; that they do not amount to confessions of guilt; were not made deliberately but under excitement; were not attended with sufficient corroborating circumstances, &c.

Whether the declarations of the prisoner were sufficient or of such character as to be taken as admissions of guilt, is not a matter to be considered by this court.   It cannot be deemed necessary for the prosecution, in order to show the declarations of the accused, to first show that no inducement or threat had been held out or made to induce or draw out the declarations.   The counsel refers to 2 Hale's P. C., 285, and 2 Hawkins, 604, as establishing the rule that "it must be testified that he made the statement or confession freely, without any menace or undue terror imposed on him."   It will be noticed, however, that this doctrine as laid down by the English courts relates to the introduction of the written statement of the prisoner made before an examining magistrate under oath, in pursuance of a statute of Ph. and Mary, and thus was not considered as entirely voluntary.   But the general rule is that admissions made by one when under compulsory process, (as where he is a witness,) are evidence against him.   Roscoe's Cr. Ev., 48, 50, and cases cited.   To require a prosecutor to show that no promises or threats had been made to the prisoner, would be in violation of a rule in regard to proving a negative, and in perhaps a majority of cases result in the exclusion of confessions and declarations, and the consequent defeat of the ends of justice.

In the present instance both Rawson and Brown expressly testify that the statements were made voluntarily; there was no hope or threat made or held out to him to the knowledge of the witnesses.   This was even more than was necessary for the prosecutor to prove.   The presumption is, that when an accused person makes statements in respect to the crime of which he is aware he is suspected, he will not make evidence

against himself unless he intends to speak the truth. See 1 Phill. Ev., 397, 9th ed. Doubtless, if the prisoner had offered to show that any undue promise or threat had been made to induce him to make the statement, the court would have received the proof and refused to hear the statement, or if it had been subsequently shown that such threat or promise had been made and that the statement was obtained thus improperly, the court would have stricken out the testimony of such statements and directed the jury to disregard them. See Boswell's case, 1 Carr. & M., 584; 41 Eng. Com. Law, 318; Simon vs. The State, 5 Fla., 285. We perceive no error in receiving the evidence of the declarations of the prisoner. The testimony and circumstances and condition of the prisoner and the witnesses were proper to be considered by the jury.

The sixth error assigned is, that the court refused to permit prisoner's counsel to ask Rawson " if it was not possible that he might have misunderstood the prisoner." We think the court was correct. If the witness had stated that it was *not possible* that he might have misunderstood the prisoner, the court and jury would very naturally have disbelieved him. Such testimony could have had no weight whatever.

The ninth error assigned is, that the court refused to rule out the testimony of Margaret Allison as to previous threats of the prisoner, and as to her interpretation of the word " foothold," used by prisoner. The testimony of this witness was that prisoner made threats against deceased, and says, " the prisoner came to the door and was making some remarks at me; he said I was too high because I stayed with Ignatio Andrea; he said he was in determination to cut my *foothold* short, and if he did not do it in less than a week he would not do it at all. That was all he said." The prosecution then asked, " what did you understand by the word 'foothold' in the connection which you understood the word?" The court permitted the question to be answered,

overruling objection, and the witness said, " I understood from the way the prisoner spoke that he would cut Ignatio Andrea; I just guessed what prisoner meant by what he said."

For aught that appears in the record, the court was correct in receiving the testimony as to the alleged threats, but in the absence of anything to show that the word " foothold" required interpretation by an expert, and that the witness was an expert in languages, we think it was proper that the jury and not the witness should have solved the question.

The 10th error alleged is, that the court admitted the testimony of Thomas C. Lloyd as to previous threats.

The testimony is, that deceased was a policeman in Jacksonville, and the question was asked of Lloyd whether on the day of the alleged murder he heard the prisoner make threats against any policeman. The witness said he did, " but not against any particular policeman." On being asked to state what those threats were, objection was made by counsel for prisoner and the court overruled the objection and allowed witness to answer.

Testimony of this character is admissible to show the *animus* of the accused at the time of the commission of the crime, and sometimes tends to identify the accused person, and is always allowed to go to the jury. Its weight is for their consideration. Murder in the first degree is defined by the statute to be the killing of a human being without authority of law, " with a premeditated design to effect the death of the person killed, or of *any* human being." In determining the nature and degree of the crime, the intent of the accused is to be ascertained, and this is often found in the character and language of threats made and the circumstances under which they are made.

The 11th error assigned is, that the court refused to permit VanDohlen to answer the question, " would you deem a man to be of sound memory and discretion who, under the circumstances, would make use of such an expression as he

made in your store ?"   We do not find that the witness had previously made any statement in regard to the subject of sound memory and discretion, and the question was not therefore asked with the view of obtaining an explanation of anything he had testified to.   If the questioner had any other purpose, the pertinency of the question is not discovered. The witness was not shown to be a proper one to give his judgment in regard to sanity or insanity.   The jury were legally competent to form a judgment in relation to the extraordinary language referred to.

The twelfth error assigned is, that the court erred in its charge upon the subject of malice, and in refusing the special instructions offered by defendant's counsel on that subject.

An examination of the whole charge of the court, which is in the record, shows that the charge was quite full, and is in fact in the language of approved authorities.   It is more full than was essential to the case, but it contains nothing calculated to mislead the jury.   The special instructions asked for on that subject were fully covered by the charge already given, and it is not error if the court refused to repeat instructions already given.

The thirteenth error assigned relates to the charge of the court as to " cooling time."   The charge in this respect is excepted to because it was irrelevant.   If this were so, and it may have been, yet nothing is found in it which was calculated to prejudice the prisoner's case.   It is in the language of the law.

The fourteenth ground of error is, that the judge charged the jury that " when the killing had been proved, the accused must show that it was attended with circumstances of accident, necessity, or infirmity, to reduce it to a lower grade of crime."   This portion of the charge is contained in the bill of exceptions.   On examining the whole charge, we find that the court had in a former portion of the charge used similar language, with this qualification added, that all the

circumstances of accident, necessity, or infirmity, are to be satisfactorily proved by the prisoner, "*unless they arise out of the evidence produced against him.*" The latter is a very important qualification, and is the language of the Supreme Court in the case of Holland vs. The State, 12 Fla., 125. We find also on page 128, of the same case, that the court uses the same language that the circuit judge employs in this case, omitting, evidently by inadvertence, the qualifying concluding words last quoted. The head notes prepared by the able judge who delivered the opinion in the case of Holland vs. The State, show that the qualifying words expressed the idea of the court and the law of the case.

To say that the fact of the killing having been proved, the accused must show by evidence on his part that there were extenuating circumstances attending the homicide, would imply that proof of such circumstances, which may have been given by the prosecution, would not avail or enure to the benefit of the accused, but that in order to have the benefit of the circumstances he must show them by his own witnesses, and could not claim the benefit of testimony already given which might weigh in his favor—a proposition not to be entertained before the courts. And although the circuit judge had given the charge in this respect correctly in a former portion of it, the subsequent incorrect instruction may have produced an unfavorable effect upon the minds of the jury.

The fifteenth and nineteenth errors assigned are, that the court erred in its charge to the jury as to confessions. Upon examining the charge upon this subject, we do not discover that any error was committed. It is compiled from accepted authorities.

The sixteenth and seventeenth errors assigned are, "that the court erred in refusing to charge the jury as to proof of the venue," and "in refusing to charge that the means of killing are necessary to be proved." The charge in these particulars

648        SUPREME COURT.

Dixon vs. The State of Florida—Opinion of Court.

is full and explicit, and very nearly in the language in which the court was requested to repeat the charge; and in fact it was repeated in the form desired. As already observed, it is not error for the court to refuse to repeat a charge already given in full.

The eighteenth error assigned is, that the court erred in its charge to the jury upon the subject of dying declarations. We think the charge given was correct. As to the action of the court in admitting the declarations of the deceased, we have already sufficiently commented.

The twentieth error assigned is, "that the court erred in its charge to the jury upon the subject of sound memory and discretion." We discover no error in the charge upon this subject.

The twenty-first error assigned is, that the charge was too extensive, and therefore erroneous upon the subject of malice. We do not think that the jury could have been led into error by the charge in this matter.

The twenty-second error assigned is, that " the court erred in giving a part of the charge to the jury verbally, and afterwards reducing it to writing; and also in misquoting a juror's question and charging accordingly."

The bill of exceptions shows that the jury, during their deliberations, returned into court, when one of them inquired of the court " whether they had to believe all the testimony that was admitted, or if they could disbelieve any part of it?" whereupon the court charged the jury *verbally* before they retired, and reduced the charge to writing, &c.

The 8th section of " an act to provide writs of error in criminal cases," approved Jan. 4, 1848, is as follows: " That charges made by judges to juries in all criminal cases, shall be reduced to writing and filed in the case, and shall be exclusively on points of law; and that any violation of this section shall be deemed and construed to be error, from which a writ of error may be prayed as of right."

An act to amend the several acts regulating judicial pro-

Dixon vs. The State of Florida—Opinion of Court.

ceedings, approved Jan. 3, 1848, provides, "that upon the trial of all common law cases, * * it shall be the duty of the judge * * to charge the jury, * * and such charge shall be wholly in writing." That upon the present-ment to the judge of instructions in writing, on points of law or exceptions taken arising on the trial, it shall be the duty of the judge to declare in writing his ruling thereon as presented, and pronounce the same to the jury as given or refused. That the judge in every case, when he shall re-fuse to give the instructions as prayed for, shall write out and declare to the jury, by way of instructions, his own ruling of the law upon the points raised, all of which shall be in writing, and shall be written out before the same are delivered; and "that all said instructions, as well those given as those denied, and also as well those prayed for by the parties as those declined by the judge, shall be signed and sealed by the said judge, and form a part of the record in the cause."

These provisions of law are plain and positive. A disre-gard or non-observance of these requirements, particularly in cases of felony, is a material error. Evidently, the pur-pose of the legislature was to afford parties the means of showing to the appellate court precisely what instructions had been given or refused, and that the charge and instruc-tions might be prepared and delivered with care and delib-eration, and that the infirmities of human memory might not be relied upon in recalling transactions of grave import, which occurred during the bustle and turmoil sometimes attending the business of a *nisi prius* term.

An instance in point occurs in the case at bar. The juror inquired "whether they had to believe all the testimony that was admitted, or if they could disbelieve any part of it?" The court charged them verbally, and then reduced his charge to writing as follows: "In regard to the query of the jury, 'whether they have the right to *reject* the testi-

mony allowed in by the court,' charged as follows: 'They cannot reject it,' " &c. The variance may not be very material, but the discrepancy is apparent, and illustrates the infirmity of the memory against which it was the purpose of the legislature to guard.

It is clearly the duty of the court to deliver its charge to the jury *as it has been written*, and not to deliver it orally and trust to memory to reproduce it in writing afterwards.

The twenty-third alleged error is, that "the court refused to allow the defendant's counsel to offer any special charge to be given to the jury upon the subject of the juror's question." The record shows that the defendant's counsel asked the privilege of submitting special instructions upon the subject of the juror's question, which the court refused to hear.

It is sufficient to remark, that the statute above mentioned expressly requires the judge, upon the presentation to him of instructions in writing which a party desires to have given to the jury, " to declare in writing his ruling thereon, as presented, and pronounce the same to the jury as given or refused ;" and he shall write out and deliver to the jury his own ruling of the law upon the points raised. This statute recognizes expressly a right which before existed, that a person accused of crime should have the right to be heard by himself and by counsel in relation to every matter transpiring on his trial; and it would be an abuse of the judicial power to deny to him this right. The court should in all cases give to the accused a reasonable opportunity to reduce to writing such instructions as he might desire upon matters transpiring during the trial. A denial of this is a denial of his right to be heard in his defense.

The twenty-fourth error alleged is, that the court allowed the jury to take with them into the jury room all the written instructions which had been given in charge by the court, and refused to let them take also the instructions which had been offered by defendant and overruled.

The charge of the court is, by law, a part of the record. It is required that the judge deliver it to the jury as it is written. If it is desired by the jury, it is difficult to perceive any good reason why they may not take to their room the writing itself. Indeed, they may thus better understand it, and avoid confusion in their deliberations. And yet, if the court should permit any portion of the written charge to be taken by the jury, he should give them the whole of it. It is required that he write out his own ruling upon the points raised by the accused, and this is a part of the "charge." We do not understand clearly from the bill of exceptions that the judge did not deliver to them all that he had written out and declared to them. But we do not think it was the duty of the court to give into the hands of the jury the written instructions prayed for and denied, unless it seemed necessary to a proper understanding of the charge of the court thereon. It is not apparent that any irregularity occurred in this latter particular.

For the reasons stated, we are obliged a second time to reverse the judgment of the Circuit Court, and to award to the plaintiff in error a new trial.